**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SPECTRUM BRANDS, INC.; PET )
TECHNOLOGY WORLDWIDE, LLC, )
                                )       No. 1:24-cv-04849
           Plaintiffs, )
                                )       Judge John J. Tharp, Jr.
           v. )
                                )
THE INDIVIDUALS, )
CORPORATIONS, LIMITED )
LIABILITY COMPANIES, )
PARTNERSHIPS, AND )
UNINCORPORATED ASSOCIATES )
IDENTIFIED IN SCHEDULE A, )
                                )
          Defendants. )
                                )

**<u>MEMORANDUM OPINION AND ORDER</u>**

They say you can't teach an old dog new tricks. But what about an old dog brush? This case concerns U.S. Patent No. 8,960,129 (the '129 patent), which aims to do precisely that. The patent, owned by Spectrum Brands, Inc., and licensed to Pet Technology Worldwide, LLC, covers a "pet grooming tool" containing an ejector used to remove fur stuck between the tool's "teeth." Spectrum Patent 1, ECF No. 1-2. Because the ejector "can be manually moved by the same hand . . . use[d] to support and hold the grooming tool," a person can hold her dog in one hand and the tool in the other—the fur goes from the dog to the teeth to the disposal, all without needing to let go of Fido. *See id.* Other grooming tools, Spectrum notes, either do not have an ejector or "contemplate[] use of a second hand" to remove hair. Reply 14, ECF No. 197.

Spectrum and Pet Technology (collectively, the "plaintiffs") filed the instant suit in June 2024,[1] seeking to enforce their intellectual property rights against over 100 allegedly infringing

_____

[1] Because Pet Technology has an exclusive license to make and sell certain "licensed products, including pet grooming vacuums, vacuum kits, and corresponding accessories that

defendants. Pending before the Court is the plaintiffs' motion for a preliminary injunction, which several defendants (collectively, the "responding defendants") oppose. Because the responding defendants have "raise[d] a substantial question about . . . [literal] infringement," and the plaintiffs have not "prove[d] . . . the question lacks substantial merit," the motion is denied as to the responding defendants. *See Spinmaster, Ltd. v. Overbreak LLC*, 404 F. Supp. 2d 1097, 1106 (N.D. Ill. 2005). The motion is granted, however, as to the remaining defendants still present in the case.

## I.      BACKGROUND

### A.      Spectrum, Pet Technology, and the '129 Patent

As noted above, the '129 patent discloses a pet grooming tool that enables one-handed fur removal. Specifically, the patent discloses a tool with a "toothed portion" (the brush) and a "fur ejector portion," the latter of which moves from a "first position" (teeth exposed) to a "second position" to eject fur. Spectrum Patent 16. In the diagram that follows, the fur ejector portion (26) moves past the toothed portion (24) when a user presses the button (68):

---

include components covered by the '129 Patent," it has standing to sue for infringement alongside Spectrum. Prelim. Inj. Mem. 4, ECF No. 45; *see, e.g.*, *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000).



Fig. 1

*Id.* at 4, 17.

Particularly relevant to the plaintiffs' motion, claim 1 of the '129 patent states that the fur ejector portion is

> configured and adapted to permit fur to pass through the gaps of the toothed portion when the edge of the fur ejector portion is in the first position, the edge of the fur ejector portion being *adapted to slidably contact* the teeth of the toothed portion and to contact fur passing through the gaps of the toothed portion in a manner forcing the fur out from the gaps of the toothed portion as the fur ejector portion moves away from the first position toward the second position.

*Id.* at 18 (emphasis added). Note the emphasized language: Under claim 1, the fur ejector portion must be "adapted to slidably contact" the teeth of the toothed portion when moving between positions. *Id.*

Spectrum, a "home essentials company . . . in the business of developing, manufacturing, and selling a wide variety of branded pet products," owns "all rights and interest in and to the '129 Patent." Compl. 3-4 ¶¶ 9-10, 18, ECF No. 1. Today, Spectrum sells handheld grooming tools covered by the '129 patent under the FURminator® brand. The FURminator® tools "have received numerous industry awards, many of which reference [their] unique fur ejecting mechanism," and they have been "among Spectrum's most successful products." Reply 2-3.

Pet Technology, evidently also in the pet-product business, was incorporated less than a month before the plaintiffs filed this suit. At some point between Pet Technology's incorporation and the filing of the complaint, Spectrum provided Pet Technology with an exclusive license to make and sell (1) vacuums, and (2) vacuum attachments incorporating "technology covered by the '129 Patent." Prelim. Inj. Mem. 4, ECF No. 45. It is unclear whether and to what extent Pet Technology has sold such vacuums or attachments.

## B.   Procedural History

Success, as the plaintiffs would tell it, breeds imitation. In June 2024, the plaintiffs filed a "Schedule A" case accusing 101 defendants—all Amazon sellers of pet vacuums—of infringing the '129 patent. The Court, based on the plaintiffs' *ex parte* presentation, entered a temporary restraining order (TRO) freezing the defendants' assets and barring them from selling any infringing products.[2] Shortly before the TRO was set to expire, the plaintiffs moved for entry of a preliminary injunction.

Then something unusual—or at least, unusual for Schedule A cases—happened. Several defendants not only (1) appeared and moved to dissolve or modify the TRO, but also

---

[2] The Court initially denied the plaintiffs' TRO motion, finding that the plaintiffs had not adequately shown a likelihood of success on the merits for each defendant. After the plaintiffs provided a claim chart illustrating the alleged infringement on a product-by-product basis, the Court granted the renewed motion for entry of a TRO.

(2) remained in the suit. The Court extended the TRO so that it could evaluate all pending motions, and it ultimately modified the TRO's asset restraint as to certain movants.[3] The Court declined to dissolve the TRO, however, noting that it would reevaluate the preliminary injunction factors (raised as a basis for dissolution) when ruling on the plaintiffs' preliminary injunction motion. Following additional briefing and a hearing, that motion is ripe for resolution.

## II. DISCUSSION

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). According to the responding defendants—defendant nos. 2, 23, 45, and 57-60—the plaintiffs have not met their burden on the first three factors.[4] The Court agrees, although it begins and ends its core analysis with factor one.

### A. Likelihood of Success on the Merits

"At the preliminary injunction stage, the burden is on the patentee to show a likelihood of success with respect to the validity of the patent and infringement by the defendant." *Spinmaster*, 404 F. Supp. 2d at 1106. It follows that "if the defendant raises a substantial question about

---

[3] Judge Jenkins, sitting as emergency judge, entered additional modifications.

[4] Given the number of defendants in this case, the Court refers to individual defendants by Schedule A number rather than by name. Although the Court also received opposition briefs from defendant nos. 12, 50, and 66, it does not count these defendants as among the responding defendants. That is because the plaintiffs settled with and dismissed defendant nos. 12 and 66, and defendant no. 50 did not appear for the preliminary injunction hearing. To the extent defendant no. 50 still opposes the preliminary injunction motion, its only argument is one the Court already rejected: that an asset restraint is inappropriate in this case. *See* Asset Restraint Order 2, ECF No. 125 ("[H]ere the plaintiffs seek both damages and equitable relief, including attorney's fees under 35 U.S.C. § 285."). The analysis that follows is thus inapplicable to defendant no. 50.

validity or infringement, and the patentee cannot prove . . . the question lacks substantial merit, then the preliminary injunction should be denied." *Id.* (citing *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1351 (Fed. Cir. 2000)). Here, the responding defendants argue that substantial questions exist as to both validity and infringement. *See, e.g.*, Br. of Def. Nos. 57-60 at 6-13, ECF No. 141.[5] The Court finds this argument unpersuasive as to validity. As to infringement, however, the Court finds a question warranting denial of the preliminary injunction as to the responding defendants.

### 1. Validity

At the outset, the Court notes that the parties' arguments center around claim 1 of the '129 patent. That claim, in its entirety,[6] reads as follows:

What is claimed is:

1. A pet grooming tool comprising:

a toothed portion, the toothed portion comprising a plurality of teeth arranged in a row and a plurality of edge segments, there being a gap between each adjacent pair of the teeth, the edge segments alternating with the teeth and bridging the gaps between the teeth, the edge segments being configured and adapted to engage loose fur in a pet's coat as such loose fur extends through the gaps in a manner removing the loose fur from the pets coat; and

a fur ejector portion, the fur ejector portion comprising an edge, the edge of the fur ejector portion being movable between a first position and a second position relative to the toothed portion, the edge segments of the toothed portion being generally between the edge of the fur ejector portion and tips of the teeth when the fur ejector portion is in the first position;

at least one biasing portion biasing the edge of the fur ejector portion away from the second position and toward the first position;

the fur ejector portion being configured and adapted to permit fur to pass through the gaps of the toothed portion when the edge of the fur ejector portion is in the first position, the edge of the fur ejector portion being adapted to slidably

---

[5] Because the responding defendants filed separate, but very similar, opposition briefs, the Court cites the brief of defendant nos. 57-60 as a representative example.

[6] The language most relevant to the parties' infringement arguments, discussed below, appears separately in section I.A above.

contact the teeth of the toothed portion and to contact fur passing through the gaps of the toothed portion in a manner forcing the fur out from the gaps of the toothed portion as the fur ejector portion moves away from the first position toward the second position.

Spectrum Patent 18.

The responding defendants contend that claim 1 is invalid (or there is at least a substantial question as to its validity) in view of the prior art. *See* 35 U.S.C. § 103 ("A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious . . . to a person having ordinary skill in the art . . . ."); *Riverwood Int'l Corp. v. Mead Corp.*, 212 F.3d 1365, 1366 (Fed. Cir. 2000) (obviousness determined, in part, based on "the scope and content of the prior art" in the field). Specifically, the responding defendants argue that claim 1 "would have been obvious" based on three prior patents: U.S. Patent No. 992,250, from 1911 (the "Rauh patent"), U.S. Patent No. 940,890, from 1909 (the "Plamondon patent"), and U.S. Patent No. 7,225,815, from 2007 (the "Kung patent"). 35 U.S.C. § 103. The Rauh and Plamondon patents disclose combs with movable plates designed to dislodge hair from the teeth:





Br. of Def. Nos. 57-60 at 11. The Kung patent discloses a brush where hair dislodged from the bristles (16) by a manually triggered combing plate (18), which moves downward over the bristles, "can be easily wiped off the outer surface" of the plate:



Figure 2

Griggs Decl. Ex. H at 3, 6, ECF No. 145-6.

In the responding defendants' view, claim 1 of the '129 patent is no more than a combination of Rauh and/or Plamondon with Kung. A person having ordinary skill in the art, that is, would have thought to take the comb-cleaning mechanism disclosed in the Rauh and/or Plamondon patents (enabling one-handed hair or fur disposal) and graft that mechanism onto Kung's brush to allow for one-handed pet grooming. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007) ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

The responding defendants are barking up the wrong tree. The Rauh and Kung patents are cited on the face of the '129 patent, and the responding defendants themselves acknowledge that the Plamondon patent "discloses a similar comb to that of Rauh." Br. of Def. Nos. 57-60 at 11. Because the Rauh and Kung patents were "before the examiner" in the application for the '129 patent, and because the Plamondon patent is "analogous to [the Rauh patent] and does not

provide any new, material information," the Court finds no "substantial question of obviousness for [the] patent in suit." *Binney & Smith v. Rose Art Indus., Inc.*, No. 94-cv-06882, 1995 WL 103532, at *6 (N.D. Ill. Mar. 3, 1995); *see Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999) (noting that, because there is a presumption the patent examiner "did his duty and knew what claims he was allowing," an obviousness challenge "is especially difficult when the prior art was before the . . . examiner during prosecution of the application" (quotation marks omitted)). The Court thus finds no substantial question of validity (or likelihood of success on the merits regarding invalidity), and it will not deny the plaintiffs' preliminary injunction motion on this ground.[7]

### 2. Infringement

That said, the Court does find a substantial question as to infringement. Recall that claim 1 of the '129 patent requires the edge of the fur ejector portion to be "adapted to slidably contact the teeth of the toothed portion." Spectrum Patent 18. The responding defendants argue that their products do not literally infringe this element of the claim: Because each product has a gap between its fur ejector and toothed portions,[8] the fur ejector portions are not "adapted to

---

[7] Even if the Rauh and Kung patents were not before the examiner, the Court would not deny the preliminary injunction motion on obviousness grounds. The responding defendants provide "no explanation or reasoning for concluding that one of skill in the art would have combined [the cited] references to produce the claimed invention," offering only a brief, conclusory statement to that effect. *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017) ("Without any explanation as to how or why the references would be combined to arrive at the claimed invention, we are left with only [impermissible] hindsight bias . . . ."). In addition, the plaintiffs have produced secondary evidence of non-obviousness (including commercial success, "awards and accolades," and purported copying of the '129 patent) to which the responding defendants have not replied. Reply 14-15; *see Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18 (1966).

[8] The gaps, the responding defendants argue, serve a key functional purpose: They prevent fur from "becoming trapped between the fur ejector and the toothed portion[s]" of the vacuum attachments they sell. Br. of Def. Nos. 57-60 at 7. While direct contact between the toothed and fur ejector portions is important for handheld grooming tools (like those sold under

*slidably contact* the teeth." *Id.* (emphasis added). A representative gap can be seen in the following illustration:



Br. of Def. Nos. 57-60 at 8; *see also id.* at 10; Br. of Def. No. 2 at 7, ECF No. 146; Br. of Def. No. 23 at 7, ECF No. 149; Br. of Def. No. 45 at 7, ECF No. 152.

The Court agrees with the responding defendants that the gaps in their products raise a substantial question regarding literal infringement. It therefore denies the plaintiffs' preliminary injunction motion as to the responding defendants.

### a.      Literal Infringement

Determining whether there is a substantial question as to infringement requires the Court to construct "adapted to slidably contact" in claim 1 of the '129 patent. The parties offer two competing interpretations of the phrase. The responding defendants argue that "adapted to" is a broad term allowing for different configurations and designs, and that "slidably contact" means

---

the FURminator® brand) because it forces fur from the teeth, it is less important for vacuum attachments, where the vacuum hose already pulls on the fur. In their telling, the responding defendants leveraged this diminished importance with an adaptation—the gaps—aimed toward minimizing vacuum clogging.

"two elements [directly] touching."[9] Br. of Def. Nos. 57-60 at 6. The plaintiffs argue that "adapted to" means "capable of," and that "capable of slidably contacting" contemplates "indirect[] and non-continuous contact" during movement. Reply 7-8 (quotation marks omitted). A gap would have no effect on infringement under the plaintiffs' reading, as even a disconnected fur ejector portion could contact the teeth of the toothed portion "through the intermediary of fur passing through the gaps" of the latter. *Id.* at 8 (quotation marks omitted).

Although the Court does not determine which reading is correct, it finds the responding defendants' interpretation (1) colorable, and (2) arguably more persuasive at this stage. Because the responding defendants' interpretation of "adapted to" is more or less "capable of," the Court focuses its analysis on the phrase "slidably contact."

Claim construction begins "with the words of the claim," and courts will generally "give a claim term . . . its ordinary meaning as understood by persons skilled in the relevant art." *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1364 (Fed. Cir. 2004) (quotation marks omitted). In the Court's view, the ordinary meaning of "slidably contact" is likely "two elements directly touching." That meaning not only comports with the dictionary

---

[9] The responding defendants assert that prosecution-history estoppel bars the plaintiffs from advancing any other interpretation of "slidably contacts," or that in the alternative the '129 patentee "disavowed claim scope and limited the claims reciting 'slidably contact' to configurations that include 'two elements [directly] touching'" during prosecution. Br. of Def. Nos. 57-60 at 6, 9; Sur-Reply 3, ECF No. 211. The Court declines to resolve either issue at this juncture. Prosecution-history estoppel is a defense to the doctrine of equivalents, *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 30 (1997), and here the plaintiffs argue they will succeed based on literal infringement alone, *see infra* section II.A.2.c. In addition, because the Court finds reasonable the responding defendants' view of "slidably contacts," it need not consider whether prosecution history prohibits a contrary reading (either because of estoppel or disavowal). Nonetheless, the Court questions whether the responding defendants have pointed to "a clear and unmistakable surrender of subject matter" (as required for argument-based estoppel) or "words or expressions of manifest exclusion or restriction" (as required for disavowal). *See Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1364 (Fed. Cir. 2006) (quotation marks omitted); *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1364 (Fed. Cir. 2004) (quotation marks omitted).

definition of "contact," but also aligns with the patentee's equation of "slidably contacts" and "slidably moves against" during prosecution.[10] *See id.* ("The ordinary . . . meaning of a claim term may be determined by reviewing . . . the claims themselves; dictionaries and treatises; and the written description, the drawings, and the prosecution history."); *Contact*, Merriam-Webster, https://www.merriam-webster.com/dictionary/contact (last updated Sept. 28, 2024) (defining the verb as "to bring into contact," and the noun as a "union or junction of surfaces").

What is more, interpreting "slidably contact" to require direct contact avoids various issues associated with the plaintiffs' interpretation. The plaintiffs' reading, unlike that of the responding defendants, would stretch the typical understanding of the word "contact."[11] It would also render a portion of claim 1 superfluous: Claim 1 specifies that the fur ejector portion is "adapted [1] to slidably contact the teeth of the toothed portion and [2] to contact fur passing through the gaps of the toothed portion," and treating a fur ejector adapted "to contact fur passing through the gaps of the toothed portion" as one "adapted to slidably contact the teeth" of that portion would obviate the need for the first clause. *See* Spectrum Patent 18; *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly

---

[10] After the examiner rejected now-claim 11 on enablement grounds, finding it unclear whether the specification (using "slidably moves against") supported the claim (using "slidably contacts"), the patentee stated that "slidably contacts" and "slidably moves against" have the same meaning. Claim 11, of course, deals with a different type of slidable contact than the slidable contact disclosed in claim 1. But a patentee can act "as his own lexicographer," and the definition of a phrase in claim 11 almost certainly informs the construction of that same phrase in claim 1. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998); *Georgia-Pac. Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1331 (Fed. Cir. 1999) ("Unless the patent otherwise provides, a claim term cannot be given a different meaning in the various claims of the same patent."). The Court does not consider this prosecution history as it relates to disavowal or estoppel. *See supra* note 9. Instead, it simply recognizes that the history is relevant insofar as it contains a "contemporaneous exchange[] between the patent applicant and the [examiner] about what [the language in claim 1 could] mean." *Digital Biometrics*, 149 F.3d at 1344.

[11] Do two surfaces separated by a gap really "contact" one another when they move? The Court expects that an individual skilled in developing pet grooming tools would say no.

disfavored to construe [claim] terms in a way that renders them void, meaningless, or superfluous."). Accordingly, the Court finds the responding defendants' reading of "slidably contact" persuasive.

The plaintiffs attempt to counter this conclusion with two arguments. Neither argument is convincing. First, the plaintiffs argue that three cases—*Plantronics, Inc. v. Aliph, Inc.*, No. 09-cv-01714, 2011 WL 4634066 (N.D. Cal. Oct. 6, 2011), *rev'd on other grounds*, 724 F.3d 1343 (Fed. Cir. 2013), *MHL TEK, LLC v. Nissan Motor Co.*, No. 07-cv-00289, 2009 WL 2824731 (E.D. Tex. Aug. 28, 2009), and *Diamond Coating Technologies, LLC v. Hyundai Motor America*, No. 13-cv-01480, 2014 WL 5698445 (C.D. Cal. Aug. 25, 2014)—compel their reading of "slidably contact." These cases, however, are distinguishable. In *Plantronics*, the court read a claim requiring "contact" with certain points of the ear to allow indirect contact through an ear cushion. 2011 WL 4634066, at *2-3. Similarly, the court in *MHL* read "contact" to permit touching "through a conductive seal." 2009 WL 2824731, at *6-7. *Plantronics* and *MHL* thus stand for the proposition that "contact" can occur through a fixed medium (for example, a seal or cushion). But there is no fixed medium here, and these cases say nothing about whether contact can occur through a temporary medium like dog fur.[12] In *Diamond Coating*, the court held that "sliding contact" is not necessarily "smooth continuous contact." *See* 2014 WL 5698445, at *5-6. *Diamond Coating* thus stands for the proposition that "contact" can include temporary contact. But the question in this case is not whether the contact is continuous or temporary; it is whether

---

[12] Given the note on superfluity above, this point may not even matter for claim-construction purposes.

contact occurs at all. None of *Plantronics*, *MHL*, or *Diamond Coating* are legally or factually on point, and these cases do not require the Court to adopt the plaintiffs' claim construction.[13]

Second, the plaintiffs argue that the '129 patent contemplates their reading because its specification, in essence, describes a small gap between the fur ejector and toothed portions. In support of this argument, the plaintiffs point to the following two sentences:

> The fur ejector portion (26) preferably comprises a fixed portion (54), a movable portion (56), and a biasing portion (58) that are preferably formed together as a monolithic piece of homogeneous plastic. . . . The movable portion (56) *has a thickness that is slightly less than* that of the fixed portion (54) and comprises a front edge (64) that is preferably linear and oriented perpendicular to the guide surfaces (62) of the fixed portion (54).

Spectrum Patent 17 (emphasis added). Because the movable portion of the fur ejector is slightly less thick than the fixed portion, and because the fixed portion is presumably what contacts the toothed portion, the specification anticipates some amount of space analogous to the responding defendants' gap.

Even on its own terms, the plaintiffs' second argument fails to persuade. Assuming the specification envisions a fixed portion in contact with the toothed portion, the fact that the movable portion is thinner than the fixed portion does not imply that there must be a gap between the movable portion and the teeth; that would depend on the shape of the movable portion and how the fur ejector transitions from thicker in the fixed portion to thinner in the movable portion. Put differently, the specification does not necessarily contemplate the movable portion narrowing in the manner shown below (see the curve in the red circle).[14] It could

---

[13] The cases, in fact, seem equally consistent with both sides' readings. "Two elements directly touching," as the responding defendants define it, could very well encompass "two elements touching through a fixed medium" and "two elements temporarily touching." The responding defendants would simply say (1) there is no touching through a fixed medium in this case, and (2) the gap ensures the relevant portions of their tools do not touch, even briefly.

[14] The plaintiffs do not argue that this figure should affect claim construction.

describe the shape in yellow rotated 180 degrees around its y-axis, which would not result in a gap:



Fig. 2

Spectrum Patent 5. In any event, "thickness that is slightly less than" could be an imperceptibly small difference, which would be categorically different than the responding defendants' visible gaps.[15] *Id.* at 17. To the extent the Court will need to consider the '129 patent's specification during claim construction, *but see Gemstar-TV Guide*, 383 F.3d at 1364, the plaintiffs' second argument fails to settle which claim 1 reading is correct.

---

[15] Indeed, the FURminator® product submitted into evidence by the plaintiffs—which appears to mirror the figure above—has no visible gap between its toothed and fur ejector portions. The Court uses "lack of visible gap" as the hallmark of touching, and leaves to Zeno the question of how close two objects must be to actually touch.

In sum, even reading "adapted to" as "capable of," the responding defendants advance a compelling reading of "slidably contact" that would preclude literal infringement where the toothed and fur ejector portions are separated by a gap. There is thus a substantial question as to whether the responding defendants literally infringe claim 1 of the '129 patent,[16] and the plaintiffs have not shown this question "lacks substantial merit." *Spinmaster*, 404 F. Supp. 2d at 1106. At least when it comes to the responding defendants, therefore, "the preliminary injunction should not issue." *Helifix*, 208 F.3d at 1351.

### b.    Manufacturing Tolerances

The plaintiffs resist this holding. Even if the responding defendants raise a substantial question as to literal infringement for certain products, they argue, there is no question that at least *some* of the responding defendants' products literally infringe. That is so because, due to manufacturing tolerances, certain products sold by the responding defendants have no gap between their toothed and fur ejector portions.

The Court is not convinced. At the preliminary injunction hearing, the responding defendants argued that, while manufacturing tolerances might make the gap between the two components smaller, they would never remove the gap entirely.[17] That argument is a plausible one: Even the allegedly infringing products submitted by the plaintiffs to illustrate their point appear to have small, visible gaps between their fur ejectors and teeth.[18] *See supra* note 15. And

---

[16] Because the Court finds a substantial question based on the gaps in the responding defendants' products, it does not address the "edge segments" arguments raised by defendant nos. 2 and 23.

[17] Emphasizing the functional importance of each gap, *see supra* note 8, the responding defendants analogized to a door. While tolerances in door manufacturing might reduce the space between the door and the door frame, they would never eliminate that space entirely. If they did, the door would cease to serve its purpose. The Court finds this analogy apt and persuasive.

[18] Given the plaintiffs' evidentiary concerns regarding the responding defendants' engineering diagrams, the Court makes this observation without reference to those diagrams.

even if those products had no gaps, it is not clear what percentage of the responding defendants' products resemble those submitted by the plaintiffs, as opposed to those (with large, obvious gaps) submitted by the responding defendants.

Should the Court adopt the responding defendants' claim construction, at a trial the plaintiffs "might be able to convince a reasonable jury that at least some of [the responding defendants' products] literally infringe [the '129 patent] as . . . construed." *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1369 (Fed. Cir. 2004). But that possibility, especially given the current unknowns, does not make the responding defendants' literal-infringement question any less substantial.[19] The Court understands the plaintiffs' position, but it does not find a preliminary injunction based solely on manufacturing tolerances warranted.

### c.    Doctrine of Equivalents

Before moving on, the Court makes a quick observation regarding the doctrine of equivalents. That doctrine, which aims to "prevent competitors from pirating the essence of an invention while narrowly avoiding the literal language of the claims," may be invoked by the plaintiffs at trial.[20] Reply 9 n.7 (citing *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 856-57 (Fed. Cir. 1988)). But the plaintiffs do not argue that a preliminary injunction is warranted under the doctrine of equivalents; they argue only that they will succeed on the merits

---

[19] The Court notes separately that "[m]anufacturing tolerances are immaterial to the interpretation of claim language." *Senmed, Inc. v. Richard-Allan Med. Indus., Inc.*, 888 F.2d 815, 820 n.10 (Fed. Cir. 1989).

[20] *But see supra* note 9 (noting that prosecution-history estoppel is a defense to the doctrine of equivalents). The responding defendants suggest that the plaintiffs are entirely "precluded from arguing infringement under the doctrine of equivalents," because they "did not allege infringement under the doctrine of equivalents" in their complaint and have not discussed the doctrine of equivalents here. Br. of Def. Nos. 57-60 at 9 & n.5. That is incorrect. A complaint need not plead a particular legal theory, *see Bennett v. Schmidt*, 153 F.3d 516, 517-18 (7th Cir. 1998), and "failing to raise an argument at the preliminary injunction stage is not inconsistent with an intent to pursue the argument during later stages of a case," *Highway J Citizens Grp., U.A. v. U.S. Dep't of Transp.*, 656 F. Supp. 2d 868, 883 (E.D. Wis. 2009).

because the defendants have literally infringed. *See id.* (noting that the plaintiffs "reserve the right to address . . . infringement under the doctrine of equivalents" later on). The plaintiffs have thus forfeited the argument for purposes of their preliminary injunction motion, and the Court considers only literal infringement when assessing the first preliminary injunction factor. *See Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 464 (7th Cir. 2021) ("[A]rguments not made in the principal brief are forfeited."); *Heinz v. Frank Lloyd Wright Found.*, 762 F. Supp. 804, 807 (N.D. Ill. 1991) (declining to consider arguments for likelihood of success not raised by the plaintiffs). Because the responding defendants have raised a substantial literal-infringement question, and because the doctrine of equivalents has not been asserted here, the Court will not preliminarily enjoin the responding defendants.

### B. Remaining Factors

Although the Court decides the present motion based on the first preliminary injunction factor, *see Spinmaster*, 404 F. Supp. 2d at 1106, a brief discussion of the remaining factors is appropriate before concluding. The Court observes that, if it were to reach the remaining factors, those factors would likely favor the responding defendants.

As to the second preliminary injunction factor—the likelihood of irreparable harm—the plaintiffs state that sales by the responding defendants will lead to "price erosion," loss of customers, "loss of market share, and reputational harm." Prelim. Inj. Mem. 3. But the truth of that statement is far from clear. Spectrum sells handheld grooming tools, and the responding defendants sell pet vacuums with various grooming attachments. The Court cannot infer, from the plaintiffs' assertions alone, that these products compete in the same market and for the same customers. *See Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990) ("[A] district court should be wary of issuing an injunction based solely upon allegations

and conclusory affidavits submitted by the plaintiff."). As the responding defendants suggested at the preliminary injunction hearing, inferring competition between Spectrum and the responding defendants might be akin to inferring that makers of tennis racquets and pickleball paddles compete because they both sell items to hit a ball over a net. And to the extent Pet Technology (which does sell vacuums) might lose market share or sales based on the responding defendants' activity, it is not clear to what extent Pet Technology had either of these things to begin with. The company, after all, was incorporated less than a month before the plaintiffs commenced this action.[21] It is far from apparent on this record that the plaintiffs have met their burden on factor two.

As to the third preliminary injunction factor—the balance of equities—the responding defendants argue that an injunction will lead to (1) hundreds of thousands of dollars in storage costs, and (2) a significant loss in sales shortly before the holiday season. It is true, as the plaintiffs note, that one who "elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." Reply 19 (quoting *E-Link Tech. Co. v. Shenzhen Uni-Sun Elecs. Co.*, No. 20-cv-00247, 2020 WL 8079816, at *3 (N.D. Ill. May 14, 2020)). But given the substantial infringement question at this stage, the Court would find "the . . . harm the [plaintiffs might] suffer if . . . relief is denied" outweighed by "the possibility of irreparable harm to the [responding defendants] if the injunction is issued." *See Chicagoland Aviation, LLC v. Todd*, No. 12-cv-01139, 2012 WL

---

[21] Of course, as an exclusive licensee of the '129 patent, Pet Technology has the right to 100% of the market for vacuum attachments embodying the patent's teachings—meaning that any infringing sales would diminish Pet Technology's market share. But assuming no infringement, it seems to be Pet Technology that is pulling away customers and decreasing the responding defendants' sales.

5949358, at *2 (N.D. Ill. Nov. 27, 2012) ("The [less] likely Plaintiff is to succeed on the merits, the [more] the balance of harms needs to weigh in its favor.").

As to the fourth factor—public interest—there is no doubt that there is a "strong public policy favoring the enforcement of patent rights." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996). Because there is doubt, however, that this case involves literal infringement (at least as to the responding defendants), it is not obvious that public policy favors injunctive relief. It is also true that the public interest disfavors the overzealous and potentially overbroad enforcement of intellectual property rights.

## III.    CONCLUSION

For the foregoing reasons, the plaintiffs' motion for a preliminary injunction is denied as to defendant nos. 2, 23, 45, and 57-60. The motion is granted as to the other defendants in this suit, who have not advanced the same arguments in opposition as the responding defendants.

Date: October 9, 2024

John J. Tharp, Jr.
United States District Judge